IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>APPROXIMATELY $77,499 IN UNITED STATES CURRENCY SEIZED FROM DELIANG HE ON APRIL 30, 2024, AT THE CHARLOTTE-DOUGLAS INTERNATIONAL AIRPORT | Civil No. 3:24-CV-00807 |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

**INTRODUCTION**

1. This is a civil action *in rem* against approximately $77,499.00 in United States Currency seized from Deliang He ("HE") on April 30, 2024, at the Charlotte-Douglas International Airport (the "Currency").

2. Law enforcement encountered HE when a drug detection K9 alerted to his checked suitcase, and a consent search of HE's luggage revealed the Currency rubber-banded in quick-count bundles hidden among clothes, towels, and paper bags. When asked the source of the Currency, HE told a self-contradictory, nonsensical, and misleading story to law enforcement: that he made the Currency as a truck driver in 2023, had previously paid it to his San Francisco roommate for 1-2 years of rent at roughly $1,000 per month, and had flown to Charlotte to pick up the Currency as payment back for the rent. On that front, the numbers simply don't add up— the $77,499.00 in Currency was far in excess of the $47,000 in legitimate income HE claimed to

have made in 2023, and far in excess of what would be a maximum of roughly $24,000 in purportedly owed rent.

3. Instead, translations of text messages from HE's phone show that HE was simply working as a courier at the behest of another, being told to pick up the Currency and to transport it on his person and in his checked luggage.

4. This conclusion is consistent with HE's travel history. Airline records reveal that—in the **roughly two months** from February 24, 2024, to April 30, 2024, HE took approximately **thirty-three round trip flights** on various airlines, typically with short turnarounds between the East Coast and San Francisco—highly unusual travel activity for a purportedly unemployed truck driver. And, contrary to his initial statements to law enforcement, HE ultimately admitted to acting as a courier on prior occasions.

5. During his encounter with law enforcement, HE texted the individual for whom he was transporting the money: "I got caught." In fact, he did.

6. The Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. § 841 and/or 846.[1]

**NATURE OF THE ACTION**

7. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C § 983, 19

---

[1] *See, e.g., United States v. $183,791.00 in U.S. Currency*, 391 Fed. Appx. 791, 795 (11th Cir. 2010) ("Although a large amount of cash alone is insufficient to meet the government's burden, it is highly probative of a connection to some illegal activity . . . legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. In contrast, drug rings do often utilize couriers to transport large amounts of cash in rubber-banded bundles.") (internal quotations and citations omitted).

U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

8. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statues confer original jurisdiction to the federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

9. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

10. The Currency has been seized and is now within the Western District of North Carolina.

11. Based on the following facts, verified by Department of Homeland Security, Homeland Security Investigations ("HSI") Task Force Officer ("TFO") Jonathan Cerdan, this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

*The April 30, 2024, interdiction and seizure*

14. On April 30, 2024, during an interdiction operation at the Charlotte-Douglas International Airport, checked luggage was pulled for an open-air K9 sniff prior to being loaded on American Airlines flight 2651 to San Francisco, California, a known drug source location.

15. Seven suitcases were placed in a lineup.

16. K9 Cali, a properly trained and certified drug detection canine, was deployed and alerted to the odor of narcotics on/from one of the checked suitcases.

17. The baggage tag affixed to the suitcase displayed the name Deliang He.

18. Law enforcement located HE in the boarding area prior to the flight's departure and TFO Altizer asked to speak with him about the suitcase.

19. HE confirmed the suitcase was his and agreed to speak with law enforcement. After the group moved to a more private area of the concourse a short distance away, HE presented his ID, and confirmed he understood English.

20. TFO Altizer explained to HE that they were speaking to him because a drug detection canine had alerted to his suitcase.

21. HE consented to a search of his checked suitcase, unlocking it for law enforcement.

22. HE also had a duffle bag and backpack with him, and he likewise consented to a search of those bags.

23. When asked if there was anything of value in the suitcase before the search, HE stated "money." TFO Cerdan asked if the money was his and where he got it from, and HE replied, "his job," which he had just quit.

24. When asked about the amount of money in the suitcase, HE, after consideration, replied that the bag contained about $40,000.00.

25. He explained he worked as a truck driver and he paid money to another truck driver that he lived with in San Francisco, and got money back from him.

26. HE identified the company he worked for in San Francisco as IE Express.

27. When asked about his backpack and if there was any money in it, HE replied there was $20,000.00 in it.

28. HE claimed he made the Currency driving for IE Express in 2023. HE again stated he paid money to a coworker in San Francisco for "housing," who then paid HE back.

29. When asked how the coworker made money to pay HE back, HE said he made it in

Charlotte as a truck driver.

30. Concurrently with the conversation, law enforcement searched the backpack and suitcase,[2] locating bundles of rubber-banded cash:



31. When asked the bundles were thousand-dollar or two-thousand-dollar stacks, HE stated they were $2,000.

---

[2] A search of HE's duffle bag revealed nothing of evidentiary value.

32. Law enforcement asked HE to show them where his coworker had contacted HE on his phone regarding the Currency, and HE replied that this friend was sleeping.

33. HE typed the coworker's name in the notes app on TFO Altizer's phone as "Fan ge qui"

34. HE further stated he was coworkers with Fan in 2023, and they both had quit IE Express. HE again confirmed all of the Currency came from last year's employment as a truck driver.

35. HE told law enforcement he had picked up the money the day before (which he later changed to two days prior on August 28th) in Charlotte from Fan at a hotel. However, HE could not remember the name of the hotel.

36. Law enforcement explained to HE they were part of Homeland Security Investigations, and were asking him questions to verify the source of the Currency, as people did not typically put that amount of cash in a suitcase rubber-banded in quick count bundles, but rather, it was typical of the transportation of narcotics proceeds back to a source location.

37. The discussion continued, in which HE again reiterated that he had given money to Fan in cash, who paid him back in cash.

38. Law enforcement indicated to HE that his story didn't make much sense, and asked him why HE would hand someone else cash just to have that person give it back to them. HE stated it was because his friend did not have a job (seemingly in contradiction to the portions of his story that his friend had been a coworker at IE Express and had made the money to pay HE as a truck drive in Charlotte).

39. HE confirmed he flew to Charlotte for the purpose of picking up the money and transporting it back to San Francisco.

40. HE claimed the total amount he was transporting was $66,500, and he had paid for Fan's rent while in San Francisco on a month by monthly basis for between 1-2 years, at a rate of $1,000 for a "half year," and $1,100 for another "half year."

41. Law enforcement pointed out that—even running the numbers for two years—that only came to about $24,000 for which Fan would have owed in him rent, and informed HE that he seemed very nervous and appeared to be trying to make up a story about where the money came from.

42. HE told TFO Cerdan that he stopped working for IE Express around December 2023, and at some time in 2024, worked for LSG Sky Chefs for just one month, and quit. He further explained he made approximately $47,000.00 in 2023 as a truck driver at IE Express, and $6,000 for the one month at LSG.

43. When asked what he was going to do with the Currency when he got to San Francisco (give it to someone, put it in a bank, etc..), HE replied he was just going to put it in his house.

44. HE granted TFO Cerdan consent to look at his phone. Messages that were immediately pulled up on the phone by HE were in Chinese, but TFO Cerdan took photos of exchanges between HE and another individual in the WeChat app.

45. In the messages, TFO Cerdan noticed a photo (shown in paragraph 62 below) of an individual sitting next to a large amount of cash. HE confirmed the money in the photograph was the Currency, but stated the messages regarding the cash were *not* with Fan, and he further did not know who the individual in the picture with the money was.

46. When asked why he was sending a picture of the money with a guy he didn't know in it, HE replied and "I want him to know I have the money," and confirmed that he was telling

someone in San Francisco that he had the money and was coming back.

47. Law enforcement asked HE to type into their phone "the name of the guy he was bringing the money back to," and HE started to type, paused, and stated, "I know his last name, but…."

48. When asked if HE had to give the Currency to that person, HE visibly froze, and did not answer.

49. Then, contradicting a previous statement that he had never picked up cash before, HE admitted that he had picked up cash in Charlotte on two prior occasions.[3]

50. Law enforcement explained that the Currency would be seized, explained the seizure process, gave HE a carbon copy of the HSI Seizure Form, and suggested he take a picture of the original as well, which HE did.

51. Law enforcement told HE they would get his checked bag on the flight for him, and HE then departed for San Francisco.

52. After the seizure, two additional blind lineups of five scent boxes (one from each lineup contained a portion of the Currency) were set up at separate times. K9 Cali was deployed each lineup and positively alerted to the scent box containing the Currency:

---

[3] At various times during his conversation with law enforcement, HE looked back to his original airport gate, and HE was told multiple times that he was free to leave if he wished.



53. Law enforcement transported the Currency to Loomis, where it was counted and deposited into an account established to hold seized funds.

54. The Currency totaled $77,499.00. and was comprised of four $1 bills, three $5 bills, one-hundred-and-two $10 bills, three-thousand-and-twenty-eight $20 bills, seventy-six $50 bills, and one-hundred-and-twenty-one $100 bills.

55. The Currency's packaging, method of concealment, and denominations are consistent with the transportation of narcotics proceeds.

*HE's travel history is consistent with that of a courier for a drug trafficking organization*

56. HE's travel history prior to the seizure of the Currency is consistent with that of a money courier.

57. Airline records reveal that—in the *roughly two months* from February 24, 2024, to April 30, 2024, He took approximately *thirty-three round trip flights* on various airlines, often to East Coast locations (such as Charlotte, Raleigh, Greensboro, Columbia, and Newark), with most having return flights to San Francisco, California and short turnarounds—highly unusual travel activity for a purportedly unemployed truck driver.

58. The Government does not presently have full records indicating the cost HE paid for all of these trips, but by way of example, the total spent with American Airlines for eight of the trips was $5,903.30. Absent a source of illicit funding, this would indicate that HE spent almost 13% of his purported 2023 legitimate income (of $47,000) on airfare for just a fraction of the early 2024 flights he took.

59. Moreover, in the roughly one-month period after the seizure, HE continued to take multiple flights with short turnarounds, roughly eight across various airlines, with most to east coast locations.

***The translated WeChat messages from HE's phone reveal he was working as a courier when transporting the Currency.***

60. The messages on HE's phone were later translated by CMPD, and they demonstrate that HE's story to law enforcement that he was picking up past rent money from his roommate was (perhaps unsurprisingly) false: instead, HE was transporting the Currency from Charlotte to San Francisco at the direction of another.

61. For example, a WeChat user named LiYuan discussed various sums of money with HE, and then instructed him to transport the Currency in his checked luggage and on his person:

> LiYuan: Let me figure it out
> LiYuan: Does Kevin have big bills
> LiYuan: 66000
> HE: [PHOTO OF CASH]
> HE: There are 4 stacks of big bills
> HE: 4 stacks of 100, one stack of 50
> LiYuan: Kevin's wife has 5000
> LiYuan: Let me figure it out
> LiYuan: Only 115000
> LiYuan: I will give her 6000
> LiYuan: You will check in 46000 in your luggage, each person carries 35000
> HE: Ok
> HE: So I will have 8.1 with me
> HE: W[4]

---

[4] W is sometimes used to represent 10 thousand in Chinese, so for example, 8.1w would be 81,000.

LiYuan: Okok
HE: Ok[5]

62. The full picture of the photo of cash HE sent LiYuan in the exchange above is shown below:



63. Similarly, another screenshot of messages with LiYuan reads:

LiYuan: Gave it to Kevin and he had counted it
LiYuan: We don't need to count it
HE: Ok
HE: 10 stacks in the sports bag, 5 stacks in the backpack, and 3 stacks on your person
HE: Is that ok
LiYuan: Okok that's fine
HE: [screenshot of flight itinerary from CLT to SFO Francisco in American Airlines app]
HE: Pick me up?
HE: I am caught[6]

---

[5] The text exchanges set forth herein are based on law enforcement's non-certified translations.
[6] When TFO Cerdan asked HE to provide him with his coworker's name and contact number to verify his story regarding the Currency, HE was texting on his phone while looking for the contact information.

## FIRST CLAIM FOR RELIEF – THE $77,499 IN CURRENCY
## (21 U.S.C. § 881(a)(6))

64. The United States incorporates by reference the allegations set forth in the paragraphs above as if fully set forth herein.

65. The $77,499.00 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## CONCLUSION AND PRAYER FOR RELIEF

66. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 6th day of September, 2024.

                                    DENA J. KING
                                  UNITED STATES ATTORNEY

                                  /s/ Seth Johnson
                                  J. Seth Johnson
                                  Texas Bar No. 24083259
                                  Assistant United States Attorney
                                  Suite 1650, Carillon Building
                                  227 West Trade Street
                                  Charlotte, North Carolina 28202
                                  Telephone: (704) 338-3159
                                  Email: seth.johnson@usdoj.gov

# VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 6th day of September, 2024.

_____
TFO Jonathan Cerdan
Department of Homeland Security,
Homeland Security Investigations